FILED

2005 Nov-08  PM 04:46
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

DEBORAH STANDIFER,       )

    PLAINTIFF,        )

VS.                    )        2:04-CV-2359-JHH

SONIC-WILLIAMS MOTORS, LLC )
d/b/a TOM WILLIAMS LEXUS,
                         )
    DEFENDANT.

## MEMORANDUM OF DECISION

The court has before it the September 15, 2005 motion (doc. # 32) of

defendant Sonic Williams Motors, LLC d/b/a Tom Williams Lexus for summary

judgment.  Pursuant to the court's September 16, 2005 and October 3, 2005 orders,

the motion was deemed submitted, without oral argument, on November 1, 2005.

### I. Procedural History

Plaintiff Deborah Standifer commenced this action on July 30, 2004 by

filing a complaint in this court alleging gender and pregnancy discrimination

under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq, and

violation of the Family and Medical Leave Act, 29 U.S.C. §§ 2601-54.  Plaintiff

contends that defendant's alleged conduct constitutes (1) disparate treatment

regarding pay and promotion under Title VII, (2) constructive discharge under Title VII, (3) a hostile work environment under Title VII, (4) interference with her FMLA rights, and (5) retaliation in violation of the FMLA.  Defendant's September 15, 2005 motion for summary judgment asserts that plaintiff has failed to establish a prima face case for any of plaintiff's claims, and, in the alternative, that she cannot establish that defendant's legitimate, nondiscriminatory reasons for its actions was pretext.

Both parties have filed briefs and submitted evidence in support of their respective positions.  Defendant submitted a brief (doc. # 32) and evidence[1] (doc. # 33) in support of its motion for summary judgment on September 15, 2005.  On October 21, 2005, plaintiff filed a brief (doc. # 43) and evidence[2] (doc. # 44) in

---

[1] The defendant submitted the following evidence: deposition of Deborah Standifer; deposition of Jeffrey Wiggins; deposition of Tom Williams, Jr.; deposition of Richard O'Connor; defendant's second amended objections and responses to plaintiff's first set of interrogatories; termination check sheet; 12/10/03 payroll/status change; e-mail from Standifer to David Levecchia; Standifer's pay plan effective 12/01/01; Standifer's pay plan 08/01/03; 10/31/03 "F&A Pay Plan" memorandum; Standifer's pay plan 12/01/03; Laura Drake's pay plan 08/01/03 & 12/01/03; 10/27/03 warning; 09/15/03 letter from Standifer to Wiggins; 12/01/03 letter from Standifer to "gentlemen"; 09/18/03 & 12/15/03 payroll/status change for Joe Paulovich; Paulovich's pay plan 12/01/03; New Hire Checklist for Chris Jones 02/27/04; Jones' pay plan 12/01/03; Jones personnel records; New Hire Checklist for Travis Walton 08/09/04; Walton pay plan 08/09/04; New Hire Checklist for Jeffrey Wong 09/03/04; Wong pay plan 09/03/04; New Hire Guarantees for Jones, Walton, and Wong; Standifer's FMLA paperwork; 07/01/03 payroll/status change; EEOC charge; complaint; declaration of Patsy Humby; Standifer's Finance and Insurance Summaries for January, February, and August 2003.

[2] The plaintiff submitted the following evidence: deposition of Deborah Standifer; deposition of Laura Drake; deposition of Tommy Williams; and deposition of Jeffrey Wiggins.

opposition to defendant's motion for summary judgment.  On November 1, 2005,

defendant filed a brief (doc. # 45) in reply to plaintiff's opposition.[3]

## II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper

"if the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to judgment as a matter of law."

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transport, 229

F.3d 1012, 1023 (11th Cir. 2000).  The party asking for summary judgment always

bears the initial responsibility of informing the court of the basis for its motion and

identifying those portions of the pleadings or filings which it believes demonstrate

---

[3] Defendant also filed a motion to strike (doc. #49) with its reply brief.  Defendant first asks the court to strike the deposition transcript of Laura Drake.  As grounds, defendant argues that the court granted plaintiff's motion in limine to exclude evidence of Drake's pay plans, and "[i]t logically follows that the same parameters should apply" at summary judgment.  The court agrees.  The portions of the deposition transcript of Laura Drake relating to her pay plan are **STRIKEN**, and the court will not consider them in deciding the motion for summary judgment.

The motion also asks the court to strike "all factual averments contained in Plaintiff's Opposition brief that are unsupported by evidentiary citations."  As grounds, defendant argues that plaintiff's statement of facts "is replete with bald argumentative 'factual' averments that are unsupported by any evidentiary citations."  Although the court understands defendant's concern, and agrees that the court is not required to "scour the record," this portion of the motion to strike is **DENIED**.  The court is able to discern those statements that are not supported by the record, and considers the record evidence, and not merely argument of counsel, in deciding whether a material issue of genuine fact exists.

As such, the motion to strike (doc. #49) is **GRANTED IN PART** and **DENIED IN PART**.

3

the absence of a genuine issue of material fact.  See id. at 323.  Once the moving

party has met its burden, Rule 56(e) requires the nonmoving party to go beyond

the pleadings and by its own affidavits, or by the depositions, answers to

interrogatories, and admissions on file, designate specific facts showing that there

is a genuine issue for trial.  See id. at 324.

The substantive law will identify which facts are material and which are

irrelevant.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  All

reasonable doubts about the facts and all justifiable inferences are resolved in

favor of the non-movant.  See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115

(11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.

If the evidence is merely colorable, or is not significantly probative, summary

judgment may be granted.  See id. at 249.

The method used by the party moving for summary judgment to discharge

its initial burden depends on whether that party bears the burden of proof on the

issue at trial.  See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four

Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991) (en banc)).  If the

moving party bears the burden of proof at trial, then it can only meet its initial

burden on summary judgment by coming forward with positive evidence

4

demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial.  See Fitzpatrick, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to

support the non-moving party's case.  See Fitzpatrick, 2 F.3d at 1115-16.  If the

movant meets its initial burden by using this second method, the non-moving party

may either point out to the court record evidence, overlooked or ignored by the

movant, sufficient to withstand a directed verdict, or the non-moving party may

come forward with additional evidence sufficient to withstand a directed verdict

motion at trial based on the alleged evidentiary deficiency.  However, when

responding, the non-movant can no longer rest on mere allegations, but must set

forth evidence of specific facts.  See Lewis v. Casey, 518 U.S. 343, 358 (1996)

(citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

### III. Relevant Undisputed Facts[4]

In 1998, Sonic-Williams Motors, LLC d/b/a Tom Williams Lexus ("TWL"

or defendant) was purchased by Sonic Automotive, Inc. ("Sonic").  (Williams Dep.

at 7; Wiggins Dep. at 19.)  Although Sonic owns many dealerships, each

dealership operates within its own corporate structure and is run separately from

other affiliated dealerships.  (Wiggins Dep. at 41.)  Sonic employees, however,

oversee the operations of each dealership, and the general manager at each

dealership is accountable to Sonic for the dealership's performance.  (Id. at 17-18,

---

[4]  If the facts are in dispute, they are stated in a manner most favor to the non-movant.
See Fitzpatrick, 2 F.3d at 1115.

6

37-38, 41.)

In June or July 2000, Standifer began her employment with TWL[5] as a Finance and Insurance Manager ("F&I manager").  (Pl. Dep. at 29-30.)  As an F&I manager, Standifer handled the paperwork relating to the financing, insurance, and/or leasing of a vehicle and attempted to sell the customer "add-on" products. (Id. at 25-26.)  Standifer's compensation was commission-based, relative to the amount of profit she produced through financing, insurance and add-on sales. (Wiggins Dep. at 140, 202-03.)

## A.  FMLA Leave

On March 12, 2003, Standifer took leave under the FMLA for the birth of her baby.  (Pl. Dep. at 54-56.)  She returned to work for a few hours a day on June 11 or 12, 2003 and returned to work full-time on June 16, 2003.  (Id. at 56.) Standifer was reinstated to the same F&I manager position and was under the same pay plan.  (Id. at 61, 164-65.)  Before her maternity leave, Standifer was the only F&I manager, but when she returned from leave she was one of two F&I managers.  (Id. at 82-83, 114-16.)

---

[5]  Standifer first worked for Tom Williams Imports, another dealership associated with Sonic, as a salesperson and insurance employee.  (Pl. Dep. at 26, 28.)  She began her employment with Tom Williams Imports in 1998 and left to work with TWL sometime in the summer of 2000.  (Id. at 29-30.)

7

### B.  Oversight of Jeffrey Wiggins

In June 2003, Sonic added TWL to the region under the oversight of Regional Vice President Jeff Wiggins.  (Wiggins Dep. at 18, 65-66.)  As part of his oversight, Wiggins determined the relative performance of the dealership by reviewing and analyzing the dealership's financial reports.  (Id. at 132-33.)

### 1.  Correction to F&I Compensation

Shortly after starting oversight of TWL, Wiggins discovered that TWL had been improperly compensating its F&I managers.  (Id. at 88-90, 110-11.)  TWL was giving its F&I managers credit for two products that were included in the sales price of every vehicle.  (Id. at 88-92.)  According to Wiggins, the F&I managers should not have been receiving commission for these products because they were not actually selling the product.  (Id. at 91-93.)  Effective July 1, 2003, Wiggins stopped the practice of allocating profits of the sales of these two products as "back end" profits and correctly allocated them as "front end" profits. (Id. at 106-07, 110-11, 115-16, 173-74.)

Standifer testified that her performance declined because of the removal of these additional products.  (Pl. Dep. at 224.)  She admitted that, before the change, her numbers on the sales of these products were high because they were part of the sale before the customer reached her desk, and that, as a result, her percentages

were "inflated." (Id. at 89-90, 95.) Standifer testified that the first month the products were removed was "a shocker," and that her profit per vehicle decreased from a range of mid-six hundred to seven hundred dollars per vehicle to a range of two or three hundred dollars per vehicle.[6] (Id. at 96; Wiggins Dep. at 134, 289.) Standifer testified that she did not believe that this change had anything to do with her maternity leave or gender. (Pl. Dep. at 98-99, 130-31.)

## 2.   Standardization

Another change implemented by Wiggins was Sonic's standardization of pay plans among its affiliated dealerships, including the pay plans of F&I managers. (Wiggins Dep. at 227, 229-34.) The standardization process involved altering the pay plan of all managers so that the pay plans at all affiliated dealerships would pay the same percentage of departmental income. (Id. at 74, 165.) The standardized pay plan was based on the net percentage pay out to the F&I manager, and were not necessarily identical at different dealerships because of the differences in availability and popularity of various products in the different locations and dealerships. (Id. at 165-66.)

When Standifer returned from maternity leave, her pay plan was the same as

---

[6] Wiggins typically spoke with the general manager about the performance of an F&I manager when the profit per vehicle dropped below $700 a car. (Wiggins Dep. at 131.)

it was before she went on leave. (Pl. Dep. at 164-65.) On August 1, 2003, Wiggins implemented the first revised pay plan at TWL. (Wiggins Dep. at 254-56.) This revised pay plan was part of Wiggins' initial efforts to move TWL toward Sonic's goal of standardization. (Id. at 254.) Although the August 2003 plan reduced the base pay per vehicle sold, it provided F&I managers with the ability to earn more commission overall than the earlier pay plan. (Id. at 255-56.) Under the August 2003 pay plan, F&I managers could earn up to 17% of the profit per vehicle. (Id. at 293.)

On October 31, 2003, Jeff Rachor, President of Sonic, sent a memorandum to all regional company executives, including Wiggins. (Def. Ex. 11.) The memorandum stated that past attempts to implement standardization for F&I manager pay plans had failed to achieve the desired result. (Id.) It also mapped out a transition plan to achieve 100% compliance. (Id.) Attached to the memorandum were two standardized templates from which the dealership could choose, but both formats had the same effect. (Id.; Wiggins Dep. at 257-59, 261.) Both plans had a maximum pay out of 15%. (Wiggins Dep. at 258-59.)

On December 1, 2003, David Lavecchia, the Regional F&I manager, and Tommy Williams, the general manager of TWL, presented Standifer with the new pay plan. (Pl. Dep. at 189; Williams Dep. at 163-64, 167-68.) This pay plan

mirrored the proposed standardized pay plan discussed in the October memorandum from Rachor.  (Wiggins Dep. at 293-94; Def. Ex. 11; Def. Ex. 12.) Standifer testified that she believed this new pay plan was less advantageous to her because of the decrease in the base commission.  (Pl. Dep. at 191-92.)

### C.  Alleged Harassment

Sometime after Standifer returned from leave, she alleges that Tommy Williams, Jeff Wiggins, and David Lavecchia harassed her because of her pregnancy and/or leave.  Standifer testified at her deposition that Williams made remarks about her leave and pregnancy at least "half a dozen times serious and at least half a dozen times sarcastically," but she believed all his comments were serious.  (Pl. Dep. at 239.)  She also testified that when she talked to Wiggins about being interested in a position at the BMW store, Wiggins responded, "Well, didn't you just have a baby?"  (Id. at 236.)  Standifer alleges that Wiggins made similar comments at least three times.  (Id. at 238.)  Standifer stated that Wiggins told her that taking three months of maternity leave "was probably not the best idea."  (Id. at 237.)  She also testified that Lavecchia "was always: Maybe you should have thought about not taking three months.  You know, you wouldn't be behind if you hadn't taken all that time off."  (Id. at 180, 240.)

### D.  Standifer's Resignation

On December 1, 2003, the same day she was given the new pay plan, Standifer submitted a resignation letter to Wiggins, Williams, Lavecchia, and Richard O'Connor, the national F&I director.  (Id. at 227-29; Def. Ex. 15.) Standifer testified that being presented with the December 1, 2003 pay plan was the last straw that caused her to resign.  (Id. at 122-23.)  Her resignation letter expressed her dissatisfaction with the new Sonic management and the changes that had taken place.  (Def. Ex. 15.)

## IV. Applicable Substantive Law and Analysis

The analysis of the plaintiff's claims will be determined not only by the nature of the allegations but also by the quality of the evidence offered in support of those claims.  See Standard v. A.B.E.L. Servs. Inc., 161 F.3d 1318, 1330 (11th Cir. 1998) ("[t]he analytical framework and burden of production var[y] depending on the method of proof chosen").  In general, a plaintiff may attempt to establish a claim of illegal employment discrimination through the use of direct evidence, circumstantial (indirect) evidence, or statistics.  See id.; see also Schoenfeld v. Babbitt, 168 F.3d 1257, 1266 (11th Cir. 1999).  A plaintiff's ability to proceed through the use of circumstantial evidence of discrimination is necessarily important because direct proof of discrimination is uncommon.  See Combs v. Plantation Patterns, 106 F.3d 1519, 1537 (11th Cir. 1997); Grigsby v.

Reynolds Metals Co., 821 F.2d 590, 595 (11th Cir. 1987).  Direct evidence is

"[s]uch evidence [which], if believed, proves the existence of a fact in issue

without inference or presumption."  Burns v. Gadsden State Community College,

908 F.2d 1512 (11th Cir. 1990).  Cf. Wright v. Southland Corp., 187 F.3d 1287,

1293-94 (11th Cir. 1999) (per Tjoflat, J.) (defining direct evidence as "evidence

from which a reasonable trier of fact could find, more probably than not, a causal

link between an adverse employment action and a protected personal

characteristic" and finding the outcomes reflected in prior case law consistent with

that definition); see also Bass v. Board of County Commissioners, Orange County,

Florida, 242 F.3d 996, 1010 (11th Cir. 2001) (discussing meaning of "direct

evidence" in the context of a Title VII race discrimination claim; "direct evidence"

refers to a type of evidence which, if true, would require no inferential leap in

order for a court to find discrimination.).  "Direct evidence is composed of only

the most blatant remarks, whose intent could be nothing other than to discriminate

on the basis of some impermissible factor."  Rojas v. Florida, 285 F.3d 1339,

1342, n.2 (11th Cir. 2001) (quoting Schoenfeld v. Babbitt, 168 F. 3d 1257, 1266

(11th Cir. 1999)) (citations and quotations omitted).  However, direct evidence

does not include "stray remarks in the workplace" or "statements by

nondecisionmakers" or "statements by decisionmakers unrelated to the decisional

13

process itself." Price Waterhouse v. Hopkins, 490 U.S. 228, 277 (O'Connor, J.,

concurring) (1989); see also EEOC v. Alton Packaging Corp., 901 F.2d 920, 924

(11th Cir. 1990) (quoting Price Waterhouse).

Here, plaintiff has presented only circumstantial evidence of gender

discrimination.[7] "In evaluating [discrimination] claims supported by

circumstantial evidence, [the courts of this circuit] use the now-familiar

framework established by the United States Supreme Court in McDonnell Douglas

Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and Texas

Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089, 67

L. Ed. 2d 207 (1981)." Combs, 106 F.3d at 1527.  Under the McDonnell Douglas

and Burdine framework, the plaintiff first has the burden of establishing a prima

facie case of discrimination, which creates a rebuttable presumption that the

employer acted illegally.  See id. at 1527-28.  The methods of presenting a prima

facie case, as well as the exact elements of the case, are not fixed; rather they are

flexible and depend to a large degree upon the facts of the particular situation.

See, e.g., Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1185

(11th Cir. 1984); Lincoln v. Board of Regents of Univ. Sys., 697 F.2d 928, 937

---

[7]   The statements alleged by Plaintiff regarding her leave and/or her pregnancy do not constitute direct evidence of discrimination.  Rather, they are examples of "stray remarks," unconnected with the decision making process, which do not rise to the level of direct evidence.

(11th Cir. 1983). In general, a plaintiff establishes a prima facie case of disparate treatment employment discrimination by showing that he or she was a qualified member of a protected class and was subjected to an adverse employment action but that otherwise similarly situated employees outside the plaintiff's class were treated dissimilarly.[8] See McDonnell Douglas, 411 U.S. at 802 (hiring); Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997) (discipline); see also Nix, 738 F.2d at 1185 (discipline); Pittman v. Hattiesburg Mun. Separate Sch. Dist., 644 F.2d 1071, 1074 (5th Cir. 1981) (wages).

After the plaintiff has shown a prima facie case and, thereby, has raised the presumption of discrimination, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions.[9] See Rojas, 285 F.3d at 1342; Combs, 106 F.3d at 1528. The employer "need not persuade the court that it was actually motivated by the proffered reasons." Burdine, 450 U.S. at 254-55; see Chapman, 229 F.3d at 1024. If the employer satisfies that burden by articulating one or more such reasons, then the presumption of discrimination

---

[8] See also McDonnell Douglas, 411 U.S. at 802 n.13 ("The facts necessary will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not applicable in every respect in different factual situations.").

[9] See Chapman, 229 F.3d at 1032 (A subjective reason is a legally sufficient, legitimate, nondiscriminatory reason if the defendant articulates a clear and reasonably specific factual basis upon which the employer based its subjective opinion.).

falls and the burden of production again shifts to the plaintiff to offer evidence

sufficient for a reasonable jury to conclude that the employer's supposedly

legitimate reason is merely a pretext for illegal discrimination.  Where the

defendant articulates multiple, reasonable, legitimate and nondiscriminatory

reasons, plaintiff must rebut each of defendant's proffered reasons.  See Chapman,

229 F.3d at 1024-25.  Although the prima facie case is irrelevant once the

employer has offered a legitimate reason for its actions, the evidence of pretext

may include the same evidence offered to establish the prima facie case.  See

Combs, 106 F.3d at 1528.

Despite this shifting of the burden of production between the plaintiff and

the defendant under the McDonnell Douglas and Burdine framework, "[t]he

ultimate burden of persuading the trier of fact that the defendant intentionally

discriminated against the plaintiff remains at all times with the plaintiff."  Burdine,

450 U.S. at 253.  Given that the ultimate burden of persuasion always lies with

the employee, a plaintiff may prevail on an employment discrimination claim and

may also defeat a summary judgement either by proving that intentional

discrimination did indeed motivate the defendant or by producing sufficient

evidence to allow a rational trier of fact to disbelieve the employer's proffered

legitimate reasons, thus permitting but not compelling the trier of fact to make a

16

finding of illegal discrimination.  See Reeves v. Sanderson Plumbing Prods., Inc.,

530 U.S. 133, 147-48 (2000) (pointing out that the production of the necessary

sufficient evidence by plaintiff will not always prevent the employer from

prevailing on a Rule 50 motion and suggesting that the strength of plaintiff's

prima facie case, the probative value of the proof that the employer's explanation

is false, and any other properly considered evidence that supports the employer's

case are among other factors to take into account in evaluating a Rule 50

motion);[10] St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993); Abel v. Dubberly,

210 F.3d 1334, 1339 (11th Cir. 2000); Alexander v. Fulton County, 207 F.3d

1303, 1336 (11th Cir. 2000); Combs, 106 F.3d at 1529-38 (interpreting Hicks and

the post-Hicks case law); Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 920-

21 (11th Cir. 1993).

   Plaintiff's complaint contains the following claims: (1) disparate treatment

regarding pay and promotion under Title VII, (2) a hostile work environment

under Title VII, (3) constructive discharge under Title VII, (4) interference with

her FMLA rights, and (5) retaliation in violation of the FMLA.  Defendant's

motion for summary judgment asserts that plaintiff has failed to establish a prima

---

[10] The court in Chapman modified the statement in Combs contrary to this holding in
Reeves after noting that the standard for granting summary judgment mirrors the standard for
judgment as a matter of law.  See Chapman, 229 F.3d at 1025, n.11.

face case for any of plaintiff's claims against defendant, and, in the alternative,

plaintiff failed to establish pretext.  The court will first address plaintiff's claims

under Title VII[11] and then address her claims under the FMLA.

### A. Title VII

### 1. Disparate Treatment

Standifer contends that she was treated differently than similarly situated

males in violation of Title VII.  Her claim, although inartfully argued, essentially

boils down to a disparate pay claim under Title VII.[12]  To establish a prima facie

case of disparate treatment under Title VII, Standifer must prove the following: (1)

she is a member of a protected class; (2) she was subjected to an adverse

employment action; (3) her employer treated similarly situated employees outside

---

[11] The court rejects TWL's argument that Standifer's hostile work environment claim, failure to promote or transfer claim and constructive discharge claim fall outside the scope of her EEOC charge.  The court is mindful of the Eleventh Circuit's instruction to be "extremely reluctant to allow procedural technicalities to bar claims brought under [Title VII]," and that "the scope of an EEOC complaint should not be strictly interpreted." Gregory v. Ga. Dep't of Human Servs., 355 F.3d 1277, 1280 (11th Cir. 2004) (internal quotations and citation omitted). Close review of Standifer's EEOC charge necessitates the conclusion that her complaint "was like or related to, or grew out of, the allegations contained in her EEOC charge." Id.

[12] In her brief in opposition to summary judgment, Standifer states that she suffered an adverse employment action in "not [being] considered for promotion or other hires," but she does not make any argument regarding a denial of promotion or transfer claim. (Pl. Br. at 12.)  In addition, Standifer does not present any facts to the court regarding a denial of a promotion or other job opportunities.  As a result, it is impossible for the court to evaluate such a claim.  To the extent that Standifer asserts a denial of a promotion or transfer claim, the court finds that Standifer has waived this claim by not making any argument in support of it. See Rowe v. Schreiber, 139 F.3d 1381, 1382 n.1 (11th Cir.1998).

the protected class more favorably; and (4) she was qualified to do the job."
Maniccia v. Brown, 171 F.3d 1364, 1369 (11th Cir. 1999).  TWL contends that
Standifer cannot establish the second or third element of her prima facie case.

There are three potential adverse employment actions related to Standifer's
pay.  The first was in July 2003 when the additional products were removed and
prevented her from receiving commission from these items.  Although defendant
contends that this change was not an actual change in her pay plan, (Def. Reply
Br. at 1-2), this fact is irrelevant.  It is undisputed that the removal of these
products affected Standifer's pay.  See Gillis v. Ga. Dep't of Corrs., 400 F.3d 883,
887 (11th Cir. 2005) ("actions that affect compensation are considered adverse
employment actions").  As such, their removal was an adverse employment action.

The second potential adverse employment action related to Standifer's pay
was in August 2003 when her pay plan changed for the first time.  The record does
not support the conclusion that this pay change was an adverse employment
action.  In fact, the record supports the opposition conclusion.  At first glance, the
pay plan appears to reduce Standifer's pay because the plan reduced the base pay
per vehicle sold.  However, closer examination reveals that it actually provided
Standifer with the ability to earn more commission than the earlier pay plan.
(Wiggins Dep. at 255-56.)  Under the August 2003 pay plan, Standifer could earn

19

up to 17% of the profit per vehicle.  (Id. at 293.)  As such, the court concludes that this pay plan was not an adverse employment action.

The third potential adverse employment action related to Standifer's pay was on December 1, 2003 when her pay plan changed for a second time.  As compared to the August 1, 2003 pay plan, this plan was an adverse employment action.   See Gillis, 400 F.3d at 887.  Under this plan, Standifer could only earn up to 15% of the profit per vehicle.  (Wiggins Dep. at 258-59.)  That Standifer never worked under this new plan (because she resigned the same day) does not change the fact that it was an adverse employment action.

Although the court concludes that Standifer suffered two separate adverse employment actions, the court does not need to discuss separately the fourth element of the prima facie case regarding each alleged discriminatory action because Standifer's prima facie case for both adverse actions fails for the same reason.  Standifer has not presented evidence from which a trier of fact could conclude that TWL treated a similarly situated employee outside her protected class more favorably.

First, Standifer has not identified any person outside her protected class (female) whom she alleges was treated better than herself.  Although Standifer is not required to point to a specific individual by name, she must at least assert that

20

a male was treated more favorably than herself regarding her pay.  See Walker v.

Mortham, 158 F.3d 1177, 1193 (11th Cir. 1998).  Remarkably, Standifer does not

even state that TWL treated a similarly situated male more favorably.  Instead, her

brief merely asserts, without any citation to the record, that TWL "treated similarly

situated employees different by not reducing their pay . . . that were not available

to" her.  (Pl. Br. at 12.)   This bald assertion is insufficient.

Second, Standifer has failed to produce evidence from which a reasonable

jury could conclude that a similarly situated male employee[13] was treated more

favorably than she.  Instead, the record establishes that the two adverse changes to

her compensation were made to the compensation of the other F&I managers

employed by TWL.  The July 1, 2003 change was a correction made by Wiggins.

(Wiggins Dep. at 88-92, 110-11.)  He testified that the F&I managers should not

have been receiving commission on products that they did not sell, and the change

affected all F&I managers.  (Id.)  The December 1, 2003 pay plan was part of

Sonic's standardization, and all F&I managers at TWL were under this pay plan.

(Cf. Def. Exs. 12, 19, 22, 25, 27.)   As such, Standifer has failed to establish a

prima facie case of discrimination.  Summary judgment is due to be granted as to

---

[13]  The newly hired F&I managers who received a 90-day guarantee of their salary are not similarly situated to Standifer.

21

this claim.

## 2. Hostile Work Environment

Standifer contends that she was subjected to a hostile work environment on the basis of sex in violation of Title VII. She asserts that "[t]he harassment was based on [Standifer's] gender, i.e. her pregnancy and taking of leave due to childbirth." (Pl. Br. at 18.) TWL contends that any alleged harassment was not sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment.

A hostile work environment claim under Title VII is established upon proof that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 370 (1993). The Eleventh Circuit has repeatedly instructed that a plaintiff wishing to establish a hostile work environment claim must show: (1) that she belongs to a protected group; (2) that she has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee, such as sex; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and

22

(5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.  Mendoza v. Borden , 195 F.3d 1238, 1245 (11th Cir. 1998). TWL argues that Standifer cannot meet the fourth prong of her prima facie case.  (Def. Br. at 42-43.)

To determine whether harassment was severe and pervasive to alter Standifer's terms and conditions of employment the court considers the following four factors: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." Allen v. Tyson Foods, 121 F.3d 642, 647 (11th Cir. 1997) (citing and applying Harris, 510 U.S. at 23).  In addition, the employee must meet both a subjective and objective test.  See Mendoza, 195 F.3d at 1246.  The employee must establish not only that she subjectively perceived the environment as hostile, but also that a reasonable person would perceive the environment to be hostile and abusive.  Watkins v. Bowden, 105 F.3d 1344, 1355-56 (11th Cir. 1997).  The objective severity of harassment should be judged from the perspective of a reasonable person in the employee's position, considering all the circumstances.  Id.

The only allegations in the record regarding any harassment are as follows:

23

1.  Williams made remarks about her leave and pregnancy at least "half a dozen times serious and at least half a dozen times sarcastically," but she believed all his comments were serious.  (Pl. Dep. at 239.)

2.  When Standifer spoke to Wiggins about being interested in a position at the BMW store, Wiggins responded, "Well, didn't you just have a baby?"  (Id. at 236.)  Standifer alleges that Wiggins made similar comments at least three times.  (Id. at 238.)

3.  Wiggins told her that taking three months of maternity leave "was probably not the best idea."  (Id. at 237.)

4.  Lavecchia "was always: Maybe you should have thought about not taking three months.  You know, you wouldn't be behind if you hadn't taken all that time off."  (Id. at 180, 240.)

In her brief, Standifer also contends that the "reduc[ion] [of] her pay" was part of the harassment.  (Pl. Br. at 18.)

These allegations do not come close to establishing that the harassment was severe and pervasive.  First, the record does not establish that these remarks were particularly frequent.  Although the record is unclear as to the timing of the comments, what the court can glean from the record is that in the six months since her return to work, three decisionmakers made a total of seventeen comments to Standifer regarding her maternity leave.  Such sporadic comments cannot be said to be frequent.  Second, although these comments were offensive to Standifer, they were not particularly severe, and were definitely not physically threatening or humiliating.  At the most, they were offensive utterances.  Finally, although Standifer's performance decreased after her return from leave, the record does not

24

establish that these comments interfered with her ability to do her job.  Instead,

Standifer admitted in her deposition, that her declining job performance was

directly linked to the elimination of the two products from her commission.  (Pl.

Dep. at 96.)

Allowing Standifer's hostile environment claims to continue would be

dishonest to the longstanding proposition that Title VII is not a federal "civility

code."  Oncale v. Sundowner Offshore Serv., Inc., 523 U.S. 75 (1998).

Construing the facts in the light most favorable to Standifer in the totality of the

circumstances, the actions complained of by Standifer were not sufficiently severe

or pervasive to alter her terms or conditions of employment.  TWL, therefore, is

entitled to summary judgment as to this claim.

### 3.  Constructive Discharge

Standifer argues that she was constructively discharged based on two

separate set of facts.  First, she contends that she was constructively discharged

because of the hostile work environment created by the "continuous statements by

the decisionmakers regarding her . . . maternity leave."  (Pl. Br. at 17.)  Second,

she contends that she was constructively discharged because of the changes in her

pay scale.  (Id.)

To maintain a constructive discharge claim based on hostile work

environment, Standifer must show that her working conditions were "so difficult . . . that a reasonable person would have felt compelled to resign." Pipkins v. City of Temple Terrace, Fla., 267 F.3d 1197, 1201 (11th Cir.2001) (internal quotation marks and citations omitted). "The standard for proving constructive discharge is higher than the standard for proving a hostile work environment." Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d 1208, 1231 (11th Cir.2001). As explained above, Standifer failed to meet even the standard for a hostile work environment. She, therefore, cannot meet the higher standard for constructive discharge.

As to her second theory, a constructive discharge occurs when a discriminatory employer imposes working conditions that are so intolerable that a reasonable person in the employee's position would have been compelled to resign. See Poole v. Country Club of Columbus, Inc., 129 F.3d 551, 553 (11th Cir. 1997). The three changes in Standifer's pay do not rise to the required level of being "so intolerable that a reasonable person would feel compelled to resign." Although Standifer may have been frustrated with the changes in her pay, dissatisfaction with her pay structure does not amount to discriminatory actions on the part of TWL, especially since there is no evidence that such changes had anything to do with Standifer's sex. See Section IV.A.1. As such, summary judgment is due to be granted on her claim of constructive discharge.

26

*B.  FMLA*

The FMLA grants eligible employees the right to "12 workweeks of leave during any 12-month period . . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee," 29 U.S.C. § 2612(a)(1), and, following the leave, the right "to be restored by the employer to the position of employment held by the employee when the leave commenced" or to an equivalent position, 29 U.S.C. § 2614(a)(1). To preserve these rights, there are two types of claims available to employees under the FMLA: interference and retaliation claims.[14]  See Strickland v. Water Works & Sewer Bd., 239 F.3d 1199, 1206 (11th Cir. 2001).  In an interference claim, the employee must show only that she "was entitled to the benefit denied." Id. (citations omitted).  In contrast, with a retaliation claim, the employee "faces the increased burden of showing that his employer's actions were motivated by an impermissible retaliatory or discriminatory animus."  Id. at 1206-07 (citation and internal quotation marks omitted).

---

[14] While the FMLA does not clearly delineate these two claims with the labels "interference" and "retaliation," those are the labels courts have used in describing an employee's claims under the Act. See, e.g., O'Connor v. PCA Family Health Plan, Inc., 200 F.3d 1349, 1352 (11th Cir. 2000).

27

1. <u>Interference</u>

Standifer contends that TWL interfered with her FMLA rights when it "began a systematic reduction in [her] compensation after her return" from leave. (Pl. Br. at 21.) TWL does not dispute that Standifer's pay plans changed after she returned from leave.[15] Rather, TWL asserts that it would have made the same changes that affected Standifer's compensation even if she had been continuously employed. (Def. Br. at 46.)

Standifer's interference claim fails for two reasons. First, Standifer was not entitled to reinstatement in the same or equivalent position because she took 13 weeks, not 12 weeks, off of work. Standifer's first day of leave was Wednesday, March 12, 2003, and her last day of leave was approximately[16] Tuesday, June 10, 2005. (Pl. Dep. at 56.) Her twelfth week of leave, therefore, ended on Tuesday, June 3, 2005. Because she was absent for more than the protected period of time, Standifer did not have a right to be restored to her prior or similar position. <u>See</u> 29 U.S.C. § 2614(a)(1); <u>see also</u> <u>McGregor v. Autozone, Inc.</u>, 180 F.3d 1305, 1308 (11th Cir. 1999).

---

[15]  It is undisputed, however, that when Standifer returned from leave, she was reinstated into the same position and that her pay plan remained the same.

[16]  Standifer testified that she returned to work either Wednesday, June 11 or Thursday, June 12. (Pl. Dep. at 56.)

Second, the FMLA does not put an employee in a better position or give an employee greater rights to benefits and conditions of employment than if the employee had been continuously employed with the company during the FMLA leave period.  See 29 C.F.R. § 825.216(a); O'Connor v. PCA Family Health Plan, Inc., 200 F.3d 1349, 1354 (11th Cir. 2000).  It is undisputed that Standifer returned to work under the same pay plan that was in place when she left on leave. (Pl. Dep. at 82-83.)  Two weeks later, on July 1, 2005, the extra products were removed from her commissions.  (Wiggins Dep. at 106-07, 110-11, 115-16, 173-74.)  The record establishes that this change applied to all F&I managers and would have happened regardless of Standifer's leave.  In fact, Standifer admitted that she did not believe this change occurred because of her leave.  (Pl. Dep. at 130-31.)  TWL also changed Standifer's pay plan on August 1, 2003 and on December 1, 2003.  The record is undisputed, however, that these changes were a part of Sonic's efforts to standardize their pay plans among all affiliated dealerships.  Standifer's argument to the contrary (without any citation to the record) is not faithful to the record presented to the court.  Because the changes to Standifer's pay plan would have been implemented regardless of her leave, TWL's actions did not violate the FMLA.  See O'Connor, 200 F.3d at 1354-55. Summary judgment is due to be granted as to Standifer's FMLA interference claim.

29

2.  <u>Retaliation</u>

When a plaintiff asserts a claim of retaliation under the FMLA, in the absence of direct evidence of the employer's intent, the same burden-shifting framework established by the Supreme Court in <u>McDonnell Douglas</u> applies.  <u>See</u> <u>Brungart v. BellSouth Telecomm. Inc.</u>, 231 F.3d 791, 798 (11th Cir. 2000). To state a claim of retaliation, an employee must prove that: (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment decision; and (3) the decision was causally related to the protected activity.  <u>Parris v. Miami Herald Publ'g Co.</u>, 216 F.3d 1298, 1301 (11th Cir. 2000).

Standifer established a prima facie case of retaliation.  It is undisputed that she engaged in protected activity when she took her FMLA leave in March 2003. In addition, as discussed in section IV.A.1., Standifer suffered two separate adverse employment actions.[17]  Therefore, the court will discuss each adverse employment action as a separate claim of retaliation.

a.  July 1, 2003

Standifer suffered an adverse employment action on July 1, 2003 when the products were removed from her commission.  Standifer also established a causal

_____

[17] As discussed in section IV.A.1., the August 1, 2003 pay plan was not an adverse employment action.

connection between her participation in a protected activity and this adverse employment action, because the products were removed less than a month after her return from leave.  See Brungart, 231 F.3d at 799 (close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient to create a genuine issue of material fact of a causal connection where the temporal proximity is very close).

Because Standifer established a prima facie case of discrimination, the burden shifts to TWL to articulate a legitimate, nondiscriminatory reason for its decision.  TWL asserts that the reason these additional products were eliminated from the commission of F&I managers was because F&I managers should not have been receiving commission for products that they were not actually selling. (Wiggins Dep. at 91-93.)  TWL met its burden of production.

Standifer has failed to establish that TWL's reason was a pretext for retaliation for taking FMLA leave.  She has not presented any evidence, other than temporal proximity, that the decision was in any way related to her leave.  In fact, Standifer admitted in her deposition that, although the change adversely affected her performance, she did not believe that this change had anything to do with her maternity leave or gender.  (Pl. Dep. at 130-31.)  This admission precludes her retaliation claim, and summary judgment is due to be granted on this claim.

31

b.  December 1, 2003

The December 1, 2003 pay plan was also an adverse employment action. Standifer, however, cannot establish that this decision was causally related to her leave.  The December 2003 pay plan was implemented six months after she returned from leave.  This six-month period between her leave and the adverse employment action is not "very close" as to establish the necessary temporal proximity.  See Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) (internal quotations omitted).  As such, summary judgment is due to be granted as to this claim of retaliation.

## V.  CONCLUSION

In summary, the court finds that no material issues of fact remain and that defendant Sonic Williams Motors, LLC d/b/a Tom Williams Lexus is entitled to judgment as a matter of law as to all claims asserted by plaintiff.[18]

A separate order will be entered.

**DONE** this the ___8th___ day of November, 2005.

_____

SENIOR UNITED STATES DISTRICT JUDGE

---

[18] The court's decision renders **MOOT** the plaintiff's motion (doc. #39) to file her witness and exhibit list out of time and defendant's motion (doc. #41) to strike plaintiff's belated witness and exhibit list.

32